UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| 3TAC, LLC, and | : | |
| WEST LOOP SOUTH, LLC, | : | |
| | : | |
| **Plaintiffs,** | : | Civil Action No. 1:16-cv-08795 (LTS) (JCF) |
| | : | |
| - against – | : | |
| | : | JURY TRIAL DEMANDED |
| ICONIX BRAND GROUP, INC., | : | |
| IP HOLDINGS UNLTD., LLC, and | : | |
| NEIL COLE, | : | |
| | : | |
| **Defendants.** | : | |

## THIRD AMENDED COMPLAINT

As and for their Third Amended Complaint, Plaintiffs 3TAC, LLC ("Plaintiff 3TAC") and West Loop South, LLC ("Plaintiff West Loop") (together, "Plaintiffs"), by and through their undersigned counsel, hereby assert causes of action against Defendants Iconix Brand Group, Inc. ("Defendant Iconix"), IP Holdings Unltd., LLC ("Defendant IPHU") and Neil Cole ("Defendant Cole") (collectively, "Defendants") as follows:

## Introduction

1.      This litigation arises from (a) Plaintiff 3TAC having paid millions of dollars to Defendant IPHU (a subsidiary of Defendant Iconix for which Defendant Cole served as Chief Executive Officer) in exchange for Defendants having extended the term of a written license agreement pursuant to which Plaintiff 3TAC received the right to use and sublicense use of certain trademarks on and in connection with sale of apparel products for an extended period through and including September 30, 2015; and (b) Defendants having acted in bad faith and with malice by accepting that multi-million dollar payment only to then knowingly and intentionally impair the value of Plaintiff 3TAC's license, and Plaintiff 3TAC's associated

1

sublicense to Plaintiff West Loop, by (1) falsely representing to third-parties (including to Plaintiff West Loop's actual and/or prospective customers) that Plaintiffs' licenses had terminated when they in fact had been in full force and effect by way of an agreed-upon and fully-paid for extension; and (2) thereafter granting to New Rise Brand Holdings, LLC ("New Rise") an exclusive license of rights directly inconsistent with the terms of the non-exclusive license that previously had been granted to Plaintiffs.

2.      By this litigation, Plaintiffs seek millions of dollars in compensatory, punitive and other damages from Defendants based on claims for breach of contract, unjust enrichment, tortious interference with contract, tortious interference with prospective business relations, trade libel, unfair competition, and prima facie tort.

## Parties

3.      Plaintiff 3TAC is a limited liability company formed under the laws of the State of New Jersey, with its principal place of business in New Jersey.

4.      By virtue of the citizenship of its members, Plaintiff 3TAC is a citizen of each of New Jersey and Texas.

5.      Plaintiff West Loop is a limited liability company formed under the laws of the State of Texas, with its principal place of business at 6300 West Loop S., Suite 100, Bellaire, TX 77401.

6.      By virtue of the citizenship of its members, Plaintiff West Loop is a citizen of Texas.

7.      Plaintiff 3TAC and Plaintiff West Loop are affiliated entities.

8.      Upon information and belief, Defendant Iconix is a corporation formed under the laws of the State of Delaware, with its principal place of business at 1450 Broadway, New

York, NY 10018.

9.      Upon information and belief, Defendant IPHU is a limited liability company formed under the laws of the State of Delaware, with its principal place of business at 1450 Broadway, New York, NY 10018.

10.     By virtue of the citizenship of its member, Defendant IPHU is a citizen of each of Delaware and New York.

11.     Defendant IPHU and Defendant Iconix are affiliated entities.  More particularly, at all relevant times, Defendant IPHU has been a subsidiary of Defendant Iconix.

12.     Defendant Cole is an individual who, upon information and belief, resides in New York State and had a last known business address c/o Defendant Iconix at 1450 Broadway, New York, NY 10018.   At all relevant times through his resignation from Defendant Iconix in or about August 2015, Defendant Cole served as Chief Executive Officer, President and Chairman of Defendant Iconix, and as a Board Member of Defendant IPHU.

## Jurisdiction and Venue

13.     Jurisdiction over this matter is based upon 28 U.S.C. § 1332(a)(2) as the claims made herein exceed the sum of $75,000, exclusive of interest and costs, and are between citizens of different States.

14.     Without limiting the foregoing, there is complete diversity because (a) by virtue of the citizenship of its members, Plaintiff 3TAC is a citizen of each of New Jersey and Texas; (b) by virtue of the citizenship of its members, Plaintiff West Loop is a citizen of each of New Jersey and Texas; (c) Defendant Iconix is a citizen of each of Delaware and New York; (d) by virtue of the citizenship of its member, Defendant IPHU is a citizen of each of Delaware and New York; and (e) Defendant Cole is a citizen of New York.

3

15.     Venue in this Court is proper under 28 U.S.C. § 1391, including because this is the judicial district in which Defendants reside.

## Facts

A.  Seth Gerszberg and Marc Ecko Enterprises (Pre-October 26, 2009)

16.     At all relevant times, the term "Marc Ecko Enterprises" and/or its acronym "MEE" made reference to a group of affiliated companies ultimately owned by, controlled by and/or otherwise affiliated with an individual named Seth Gerszberg ("Gerszberg").

17.     At all times prior to October 26, 2009, MEE had a relatively complex corporate structure.

18.     More specifically, at all times prior to October 26, 2009, MEE included (a) a number of different affiliated intellectual property holding companies which, among other things, owned global intellectual property rights in and to the ECKO UNLTD.®, MARC ECKO® and ZOO YORK® fashion brands (the "Brands"); and (b) a number of different affiliated operating companies which operated global apparel and other businesses using the Brands under licenses from one or more of those intellectual property holding companies.

19.     Each of the operating companies forming part of MEE served a different purpose. By way of example, (a) one or more of the operating companies operated wholesale businesses under the ECKO UNLTD.® and/or MARC ECKO® brands (together, the "Ecko Brands"); (b) one or more of the operating companies operated wholesale businesses under the ZOO YORK® brand (the "Zoo York Brand"); (c) one or more of the operating companies operated brick-and-mortar retail businesses for the Brands (including without limitation through a chain of more than 100 brick-and-mortar retail stores); (d) one or more of the operating companies operated e-commerce businesses for the Brands; and (e) while some such operating companies operated

such businesses in and throughout the United States, other such operating companies operated

such businesses in and throughout other particular countries throughout the world.

20.     MEE had monetized the Ecko Brands and Zoo York Brand through direct

wholesale and retail operations in the field of casual apparel, and also by way of third-party

licenses generating sales across multiple product categories (e.g., footwear, skateboards,

watches) and geographic territories (e.g., Canada, Asia, Europe, South America). As such, as of

October 26, 2009, the Ecko Brands and Zoo York Brand were hugely successful global brands,

having generated more than $1 Billion in annual retail sales.

B.     <u>Defendant Iconix</u>

21.     At all relevant times, Defendant Iconix has been (and it continues to be) a public

company registered on the NASDAQ exchange under stock symbol "ICON".

22.     On its website (www.IconixBrand.com), Defendant Iconix holds itself out as

"the world's premier brand management company and owner of a diversified portfolio of strong

global consumer brands across fashion, sports, entertainment and home."  Defendant Iconix's

website further claims that Defendant Iconix "specializes in marketing, merchandising and

licensing its brand portfolio and has over 1,100 licenses with leading retailers and

manufacturers worldwide that sell across various distribution channels from the mass tier to the

luxury market, as well as through various media outlets."

23.     As of October 26, 2009, Defendant Iconix owned numerous apparel and other

brands including without limitation Candie's, Bongo, Joe Boxer, Mudd, London Fog, Ocean

Pacific, Rocawear, Cannon and Starter.

24.     As a "brand management company", Defendant Iconix does not conduct

operations in the form of manufacture and distribution activities, but rather "manages" brands

through administration of licensing programs.  As such, Defendant Iconix licenses its brands to operating companies which in turn design, manufacture, sell and distribute product subject to contractual obligations to make royalty payments to Defendant Iconix.

25.     Royalty payments paid to Defendant Iconix by its licensees are most typically calculated as a percentage of actual sales by the licensees coupled with pre-negotiated guaranteed minimum sales and/or royalty commitments.

26.     Defendant Iconix's revenue stream is primarily a function of royalty payments payable to Defendant Iconix by its various licensees.

C.  The October 26, 2009 Transaction

27.     On October 26, 2009, Gerszberg (together with his affiliated entities forming part of MEE) and Defendant Iconix entered into a major business transaction (the "2009 Transaction") by which, among other things, Defendant IPHU was formed to serve as a "brand management company" for the Ecko Brands and Zoo York Brand.

28.     Under the terms of the various transaction documents underlying the 2009 Transaction, including without limitation an operating agreement of Defendant IPHU (the "IPHU Operating Agreement"), among other things:

(a)     Defendant IPHU was owned as follows:  51% of the membership interests were owned by Defendant Iconix and 49% of the membership interests were owned by a company owned 100% by Gerszberg named Suchman, LLC ("Suchman");

(b)     Defendant IPHU acquired global ownership of the Ecko Brands and Zoo York Brand;

(c)     Defendant IPHU acquired all then-existing third-party license agreements, and future licensing rights, for the Ecko Brands and ZOO York Brand, including

without limitation the right to receive all royalty streams in connection therewith; and

> (d)    by virtue of a "license-back" arrangement, Defendant IPHU granted a new license pursuant to which MEE (and/or any other entities then or thereafter owned by, controlled by and/or otherwise affiliated with Gerszberg) would continue to operate wholesale, brick-and-mortar retail and e-commerce businesses for the Brands throughout the world.

D.    The Formation and Structure of the MEE License Agreement.

29.    A material component of the 2009 Transaction was the aforementioned license-back arrangement, pursuant to which Defendant IPHU (which was acquiring ownership of the Brand from MEE) would simultaneously license those Brands back to MEE (and/or any other entities then or thereafter owned by, controlled by and/or otherwise affiliated with Gerszberg).

30.    The aforementioned license-back arrangement in theory could have been implemented through a series of multiple, parallel license agreements by which Defendant IPHU would have granted identical licenses to each of the numerous entities forming part of MEE. That method, however, raised various legal and administrative complexities, including because (a) various terms of the licensing arrangement (for example, minimum royalty commitments and renewal thresholds) were intended to apply across all of Gerszberg's numerous operating entities collectively (rather than individually), and (b) Defendant IPHU desired to streamline the administrative mechanics of royalty payment and reporting processes, specifically preferring singular payments and singular reports from one centralized licensee-entity, rather than multiple payments and reports from multiple different affiliated entities.

31.    To solve for and simplify such matters, all parties to the 2009 Transaction (including Gerszberg, Defendant Iconix and Defendant IPHU) agreed to structure the 2009 Transaction as follows:  (a) Gerszberg formed a new entity (Plaintiff 3TAC) for the sole and

express purpose of serving as an intermediary pass-through entity which would have no actual operations; and (b) Defendant IPHU granted a license of rights to Plaintiff 3TAC which would be subject to immediately pre-approved sublicenses by which all rights granted to Plaintiff 3TAC in fact were granted to any and all entities then or thereafter owned by, controlled by and/or otherwise affiliated with Gerszberg.

32.     The aforementioned pass-through licensing structure was intended to allow all of Gerszberg's entities to receive the functional equivalent of direct licenses from Defendant IPHU, but in a manner which solved for administrative complexities, because (a) various terms of the licensing arrangement (for example, minimum royalty commitments and renewal thresholds) could be papered by reference to a single licensee (Plaintiff 3TAC), but subject to pass-through across all of Gerszberg's numerous operating entities collectively (rather than individually) for all purposes, and (b) Defendant IPHU was able to streamline royalty payment and reporting processes, so as to receive singular payments and singular reports from one centralized pass-through licensee-entity (which in turn would consolidate data from all affiliated operating entities), rather than receive multiple payments and reports from several different but affiliated entities, all of which were subject to consolidated treatment under the terms of the license.

33.     Plaintiff 3TAC never was intended to have any actual form of operation apart from passing-through rights from Defendant IPHU to any and all affiliates of Gerszberg.  As such, all entities forming part of MEE were intended to receive the full benefits of any and all rights granted by Defendant IPHU to Plaintiff 3TAC no differently than they would have had they been labeled as direct licensees.

34.     The aforementioned deal structure constituted the very essence underlying the entirety of the MEE License Agreement.  The entire purpose of the license agreement was to

8

provide for such license via pass-through to any and all entities then and/or at any time thereafter affiliated with Gerszberg.  All such affiliated sublicensees, including Plaintiff West Loop, were intended beneficiaries of the MEE License Agreement.

35.    Consistent with the above, Plaintiff 3TAC and Defendant IPHU were parties to a written license agreement comprised of the following documents (all of which are hereinafter collectively referred to as the "MEE License Agreement"):

A.    that certain written Global License Agreement dated as of October 30, 2009, a true and correct copy of which is annexed as Exhibit A hereto;

B.    that certain written First Amendment to Global License Agreement dated as of November 1, 2010, a true and correct copy of which is annexed as Exhibit B hereto;

C.    that certain written Second Amendment to Global License Agreement dated as of July 27, 2011, a true and correct copy of which is annexed as Exhibit C hereto;

D.    that certain written Third Amendment to Global License Agreement dated as of September 30, 2011, a true and correct copy of which is annexed as Exhibit D hereto; and

E.    that certain written Fourth Amendment to Global License Agreement dated as of May 17, 2013 (the "Fourth Amendment"), a true and correct copy of which is annexed as Exhibit E hereto.

36.    Pursuant to the MEE License Agreement, Defendant IPHU granted to Plaintiff 3TAC a license to use and sublicense use of certain intellectual property rights, including the Ecko Brands, throughout the United States of America and much of the world (including key countries in Europe) on and in connection with design, manufacture, distribution, sale and/or promotion of certain apparel and other products, throughout the term of the MEE License Agreement.

37.     Under Section 1.1(a) of the MEE License Agreement, Defendant IPHU granted to Plaintiff 3TAC the "right and license during the Term to use the Ecko IP within the Ecko Territory, on and in connection with the design, manufacture, distribution, sale and/or promotion of Products" (with such capitalized terms having the meanings ascribed to them in the MEE License Agreement).

38.     In turn, Section 1.5 of the MEE License Agreement expressly permitted Plaintiff 3TAC (defined in the MEE License Agreement, as "Licensee") to sublicense its rights under the MEE License Agreement to any of Plaintiff 3TAC's Affiliates (as such term was defined in the MEE License Agreement), on the following terms and conditions:

> "1.5  Licensee shall be permitted to sublicense (i) all or any portion of the rights granted hereunder to any of Licensee's Affiliates so long as Licensee and any such Affiliate first enter into an Affiliate Sublicense Agreement. . . .  No authorized sublicense shall release Licensee from any of its obligations hereunder.  Additionally, if and to the extent Licensee sublicenses any rights to any of Affiliate(s) of Licensee, then (a) Licensee and such Affiliate(s) shall be jointly and severally liable for all obligations arising from such sublicense; and (b) all payment and reporting obligations required hereunder shall be undertaken by Licensee on behalf of itself and all such Affiliates to which it granted sublicenses."

39.     Under the terms of the MEE License Agreement, Plaintiff 3TAC was contractually obligated to pay royalties to Defendant IPHU, with such royalty payments calculated as a percentage of actual sales made by Plaintiff 3TAC's affiliated sublicensees and further subject to guaranteed minimum royalty commitments which approximated Twenty Million Dollars ($20,000,000) per year.

40.     In that 3TAC was an intermediary licensing entity without sale operations, all such royalty and/or other payment obligations owed by Plaintiff 3TAC to Defendant IPHU under the MEE License Agreement were funded and paid by Plaintiff 3TAC based on Plaintiff

3TAC's contemporaneous receipts of equal amounts from Plaintiff 3TAC's affiliated sublicensees by way of pass-through sublicense payments.

41.     All of Plaintiff 3TAC's affiliated sublicensees (including Plaintiff West Loop) were intended third-party beneficiaries of the MEE License Agreement entitled to receive the benefit of all rights granted by Defendants to Plaintiff 3TAC by way of pass-through sublicense provided for by Section 1.5 of the MEE License Agreement.  Indeed, consistent with the parties' intent to treat Plaintiff 3TAC's affiliates as though they were direct licensees under the MEE License Agreement, Plaintiff 3TAC's affiliates are expressly granted various rights in and throughout the MEE License Agreement, including for example:

A.     Section 1.3:  "Licensor additionally authorizes Licensee's Affiliates to continue making use of the Licensed Marks as part of any corporate or trade name being used by any such Affiliate(s) as of the Effective Date . . . .";

B.     Section 1.13(b)(i):  "The Retail Channels shall be located at locations to be selected by Licensee (or Licensee's Affiliates) and approved by Licensor (such approval not to be unreasonably withheld or delayed).";

C.     Section 1.13(b)(iii):  "Licensee (and/or its Affiliates) shall have the right to set prices for products in Retail Channels, in the sole discretion of Licensee and/or its Affiliates.";

D.     Section 1.13(b)(v):  "Licensee (or Licensee's Affiliates) shall keep each Retail Channel in a clean and sanitary condition and in good repair.";

E.     Section 12.1:  "Licensor will defend and hold Licensee and Licensee's Affiliates and their respective members, officers, directors, managers, employees, agents, representatives and contractors, and all of their successors and assigns, harmless from and will

indemnify each of them against any losses, liabilities, damages, claims, actions, proceedings and expenses (including interest, penalties and reasonable attorneys' fees and expenses) which any of them may incur or become obligated or liable to pay by reason of: (a) the use of the Licensed IP in accordance with the terms of this Agreement infringing or alleged to infringe upon or otherwise violate the trademark, trade name, copyright, or other intellectual property or proprietary rights of a third party; and/or (b) any misrepresentation or breach of any representation, warranty, agreement, covenant or obligation of Licensor contained in this Agreement.  Licensee shall give Licensor prompt written notice of any such claim, action or proceeding; provided, however, that failure to provide such notice shall not relieve Licensor of its obligations hereunder to the extent that such delay has not prejudiced Licensor in connection with the defense of such claim, action or proceeding.  The provisions of this Section 12.1 will survive after the expiration or termination of this Agreement."; and

F.      Section 14.2(c):  "Any Licensed Products remaining in Licensee's (and/or Licensee's Affiliates') inventory at the end of the Sell-Off Period shall be purchased by Licensor at Licensee's DDP cost for such inventory. . . .".

E.      The Critical Importance of the MEE License Agreement.

42.     From and after consummation of the 2009 Transaction, Defendant IPHU was party to dozens of license agreements from which it generated royalties and other revenues from the licensing of the Brands with respect to multiple categories of goods and/or services throughout various territories worldwide.  Of all such license agreements, the MEE License Agreement (encompassing both wholesale and retail sales of the core category of apparel in the core territories of the United States and Europe) was far and away the most valuable and the most important to Defendant IPHU's business.

43.     By way of example, in calendar year 2010, (a) sales by MEE under the MEE License Agreement approximated $280 Million, compared to sales of only $86 Million by all of Defendant IPHU's other licensees combined; and (b) royalties payable by Plaintiff 3TAC to Defendant IPHU under the MEE License Agreement approximated $15 Million, constituting nearly one-half of royalties payable by all of Defendant IPHU's licensees combined.

44.     MEE was responsible for marketing, brand stewardship and other operational activities not just for MEE's own activities under the MEE License Agreement, but also as it related to servicing Defendant IPHU's dozens of other licensees around the world.  The success or failure of MEE's operations under the MEE License Agreement directly impacted the success or failure of Defendant IPHU's other licensees based on information, designs, materials and other branding services expressly provided to those other licensees by MEE, and also because the strength, value, consumer perception and demand for Defendant IPHU's brands in the United States constituted the springboard for those elements on a worldwide basis.

F.      The Interrelated Economics Between Suchman and MEE.

45.     The 2009 Transaction created a structure by which the business, legal and economic relationships between Suchman and Defendant Iconix (as members of Defendant IPHU) and Defendant IPHU and MEE (as parties and intended beneficiaries under the MEE License Agreement) were interrelated and interdependent.   Specifically, (a) Defendant IPHU's revenues were generated from payments by its licensees, including by payments from MEE passed through Plaintiff 3TAC; (b) Suchman's revenues were generated from distributions by Defendant IPHU; and (c) Suchman used its revenues to fund MEE's operations and associated cash flow needs, including Plaintiff 3TAC's royalty payments to Defendant IPHU under the MEE License Agreement.

13

46.     Accordingly, the 2009 Transaction was predicated upon agreements and understandings by and among Defendant Iconix, Defendant IPHU, Suchman and MEE (including Plaintiff 3TAC) that Plaintiff 3TAC would use the funds distributed to Suchman by Defendant IPHU to fund Plaintiff 3TAC's pass-through royalty obligations to Defendant IPHU under the MEE License Agreement on behalf of Plaintiff 3TAC's affiliated sublicensees.

47.     To support the business relationship established in the 2009 Transaction, Suchman loaned tens of millions of dollars to MEE to support MEE's operations and expenses in connection with the MEE License Agreement.

48.     To enable Suchman to recoup the benefits of its investment through MEE's performance over an extended period, the MEE License Agreement provided that MEE's rights (including the rights of Plaintiff 3TAC and its affiliated sublicensees) under the MEE License Agreement extended for an initial term of four and one-half years (*i.e.*, through June 30, 2014), with renewal options totaling an additional sixteen years (*i.e.*, through June 30, 2030).

G.     Defendants' Malice, Bad Faith and Willful Misconduct.

49.     Over the course of the parties' relationship following the 2009 Transaction, Defendant Cole developed a personal hatred of Gerszberg, and employed a personal vendetta against Gerszberg, which resulted in Defendant Cole engaging, and causing his co-defendants to engage, in a pattern and practice of bad faith, willful misconduct and malicious activities by which they sought to bring Gerszberg and Gerszberg's businesses (including Plaintiff 3TAC and its affiliated sublicensees) to financial ruin and bankruptcy.

50.     In addition, Defendants individually and collectively engaged in a pattern and practice of malice, bad faith, willful misconduct and subversive activities by which they sought to sabotage MEE's rights under the MEE Licensee Agreement as a means to secure for

Defendant Iconix complete ownership of Defendant IPHU following the 2009 Transaction.

51.     Defendants knowingly and intentionally impaired and destroyed the value of the MEE License Agreement, as Defendants knew that doing so would financially cripple Gerszberg and all of his businesses.

52.     Defendants wrongfully implemented a "cram-down strategy" by which they sought to force Gerszberg to either sell Suchman's membership interest in Defendant IPHU to Defendant Iconix at a deep discount, or put all of his businesses (including without limitation Plaintiff 3TAC) into an immediate bankruptcy.

53.     By way of example, one or more Defendants took or caused the following wrongful actions with respect to the MEE License Agreement, all of which had the purpose and effect of devaluing the Ecko Brands, and MEE's rights under the MEE License Agreement:

a.     Defendants distorted and exploited Defendant Iconix's status as Administrative Member of Defendant IPHU by using Defendant IPHU's legal and financial departments as instruments targeting and causing harm to MEE;

b.     Defendants discriminated against MEE, including without limitation by virtue of aggressive, hostile and wrongful collection efforts, in a manner not employed by Defendants against any other licensee of Defendant IPHU;

c.     Defendants intentionally failed and refused to collect royalties owed by Defendant IPHU's licensees, from which Suchman otherwise would have received distributions used to fund MEE's operations (including royalty obligations to Defendant IPHU) under the MEE License Agreement;

d.     Defendants knowingly and intentionally created a dynamic by which MEE's sales were reduced, thereby adversely impacting Suchman's rights to distributions from

Defendant IPHU under a sliding-scale formula which provided for Suchman's percentages of profits to rise or fall together with the rise or fall of royalties collected by Defendant IPHU;

e.      Defendants intentionally failed and refused to remit sums due from Defendant IPHU to Suchman, which Defendants knew Suchman otherwise would have used to fund MEE's operations (including royalty obligations to Defendant IPHU) under the MEE License Agreement;

f.      Defendants wrongfully refused and repudiated their obligations to reimburse marketing monies expended by Suchman and its affiliates in connection with the Ecko Brands, thereby disincentivizing any further marketing, all for purposes of impairing and destroying the value of the MEE License Agreement;

g.      Defendants intentionally failed and refused to remit sums due from Defendant IPHU to MEE, which MEE otherwise would have used to fund MEE's operations (including royalty obligations to Defendant IPHU) under the MEE License Agreement;

h.      Defendants unreasonably refused to allow MEE to sell ECKO-branded products into JC Penney's and/or other similar trade channels;

i.      Defendants caused Defendant IPHU to enter into a commercially unreasonable settlement of a material litigation without Suchman's consent and over Suchman's objection, by which Suchman was deprived of distributions which otherwise would have been used to fund MEE's operations (including royalty obligations to Defendant IPHU) under the MEE License Agreement;

j.      Defendants failed and refused to fund in accordance with Defendant IPHU's agreed-upon budgets and contractual commitments, including for essential brand marketing initiatives, which in turn caused millions of dollars of damage to the Ecko Brands,

16

including loss of sales under the MEE License Agreement;

k.      Defendants concealed material conflicts of interest and engaged in wrongful self-dealing without disclosure or consent, thereby causing material prejudice to MEE under the MEE License Agreement;

l.      Defendants knowingly designed and implemented flawed and deceptive accounting methodologies for purposes of obstructing payments of distributions to Suchman which otherwise would have been used to fund MEE's operations (including royalty obligations to Defendant IPHU) under the MEE License Agreement;

m.      Defendants wrongfully scheduled and conducted meetings with MEE's retailers without notice, invitation or information sharing with Suchman, resulting in substantial prejudice to the Ecko Brands and the MEE License Agreement;

n.      Defendants failed and refused to make a downward adjustment to royalties owed by MEE to Defendant IPHU, as the MEE License Agreement had required, to account for a force majeure event (Hurricane Sandy) that had material adverse impact upon the warehousing, retail and other operations of MEE; and

o.      Defendants failed to market and support the Ecko Brands and thereby destroyed the business of Defendant IPHU's most important licensee (MEE), causing Plaintiff 3TAC to miss its minimum payment obligations to Defendant IPHU;

p.      Defendants discriminated against MEE, including without limitation by refusing to negotiate in good faith with MEE as a means of preserving the valuable MEE License Agreement;

q.      Defendants wrongfully threatened to terminate the MEE License Agreement; and

r.      Defendants wrongfully purported to terminate the MEE License

Agreement as part of a bad-faith "cram-down" strategy implemented in order to secure full

ownership of Defendant IPHU (indeed, the threat to terminate the MEE License Agreement was

combined with a wrongful threat and demand that Suchman immediately sell to Defendant

Iconix all of Suchman's ownership rights in Defendant IPHU or otherwise force some or all of

MEE into immediate bankruptcy).

54.     On information and belief, Defendant Cole, who was the CEO, President, and

Chairman of Defendant Iconix (which was the controlling member of IPHU), actively directed

and participated in all of the foregoing malicious, abusive actions and decisions against Plaintiffs

and their affiliates.  Cole caused the entities he controlled to engage in this misconduct as part of

his personal animus against, and desire to destroy, Gerszberg and his affiliated companies.

55.     Defendants' efforts to intentionally cause harm to Gerszberg and his businesses

(including the Plaintiffs) was no hidden secret.  Attached hereto as Exhibit F is a true and correct

copy of an October 18, 2015 article from the New York Post titled "Former Iconix CEO Accused

of Sabotaging the Marc Ecko Brand".  The article relates to a third-party lawsuit brought by

Marcraft Apparel Group (which was Defendant IPHU's licensee in the category of formalwear)

and corroborates that Defendants sought to "sabotage" Plaintiffs' businesses for purposes of

obtaining sole control of Defendant IPHU.  As the article states, in relevant part:

> "An explosive lawsuit alleges that majority owner Iconix and its
> former chief executive sabotaged the brand — hurting its licensing
> partners in the process — as part of a twisted plot to wrest full
> control of the business from its co-founder.
>
> Former Iconix CEO Neil Cole 'deliberately failed to market,
> promote, protect and preserve' the Ecko brand in a successful bid
> to bankrupt Seth Gerszberg, the former business partner of founder
> Marc Ecko and the brand's biggest licensee, according to the suit.

Creative differences between the two men 'set Cole on a mission to bring Gerszberg (and his companies) to financial ruin and, ultimately, bankruptcy,' the suit alleges. . . .

The suit casts a harsh light on Iconix and its former CEO. The company, which owns a slew of brands including Joe Boxer, Candie's and Rocawear, is already feeling the heat from analysts who are questioning its rapid growth. Cole stepped down in August under a cloud of accounting irregularities.

New York-based Marcraft claims Cole 'purposefully degraded' the brand in his dispute with Gerszberg over the direction of Ecko — but hid the damage from other licensing partners so they would re-up their deals and keep paying royalties. . . .

Cole refused to work with Gerszberg on a long-term marketing plan, strangling the business to the point that Gerszberg's Marc Ecko Enterprises filed for bankruptcy last year, the suit alleges. . . .

Ecko licensee Me & You Accessories, which makes handbags, also has sued Iconix, accusing it of mismanaging the brand."

H.    <u>The Fourth Amendment</u>.

56.    Defendants succeeded in their malicious efforts to sabotage the MEE License Agreement and to thereby cause substantial harm to Gerszberg and MEE, effectively destroying the value of the MEE License Agreement (and Gerszberg's tens millions of dollars of investment) and forcing Suchman to sell its interest in Defendant IPHU.

57.    Thus, on or about May 17, 2013, Gerszberg, Suchman, Plaintiff 3TAC, Defendant Iconix and Defendant IPHU entered into an interdependent transaction (the "2013 Transaction") by which, among other things, (a) Defendant Iconix bought out Suchman's equity interest in Defendant IPHU at a devalued price, pursuant to a membership interest purchase agreement (the "Membership Interest Purchase Agreement") executed by Gerszberg, Suchman, Defendant Iconix and Defendant IPHU; and (b) Defendant IPHU and Plaintiff 3TAC entered into the Fourth Amendment to the MEE License Agreement, in which Plaintiff 3TAC was forced to overpay for

what Plaintiffs later learned was an illusory license extension, and one with which Defendants intended to interfere for the malicious purpose of causing further harm to Gerszberg and his businesses, including the Plaintiffs.

58.    Under the Fourth Amendment, among other things, (a) Plaintiff 3TAC paid Nineteen Million Dollars ($19,000,000) to Defendant IPHU (the "$19 Million Dollar Payment"); and (b) the term of the MEE License Agreement, and the term of its pass-through affiliated sublicenses, were extended through and including December 31, 2014, with an additional nine (9) month sell-off period extending from January 1, 2015 through September 30, 2015.

59.    Section 7.A of the Fourth Amendment provided that the $19 Million Payment paid by Plaintiff 3TAC to Defendant IPHU was comprised of the following components: (a) Eight Million Dollars ($8,000,000) covering an agreed upon payment in full for payments then allegedly owed by Plaintiff 3TAC arising from and/or otherwise relating to any and all sales by Plaintiff 3TAC and/or its affiliates under the MEE License Agreement from inception through and including the date of entry into the Fourth Amendment (which alleged amounts due were unable to be paid because Defendants themselves had impaired and frustrated Plaintiffs' activities under the MEE License Agreement); (b) Six Million Dollars ($6,000,000) covering a flat-fee advance payment in full for any and all royalties then or at any later time owed by Plaintiff 3TAC and/or its affiliates with respect to sales made under the MEE License Agreement for the period of time from the date of entry into the Fourth Amendment through and including December 31, 2013; and (c) Five Million Dollars ($5,000,000) covering a pre-paid advance against royalties that would later be payable by Plaintiff 3TAC to Defendant IPHU arising from sales made under the MEE License Agreement (and/or associated sell-off period) for the period of time from January 1, 2014 through September 30, 2015.

60.     The Fourth Amendment was negotiated by Defendant Iconix, including through Defendant Cole, on behalf of Defendant IPHU.  Defendant Cole actively participated in and directed the negotiations and oppressive demands made by Defendants Iconix and IPHU in the period leading up to the 2013 Transaction.

61.     Plaintiff 3TAC would not have made the $19 Million Payment to Defendant IPHU (as provided for by the Fourth Amendment) had Plaintiff 3TAC not received from Defendant IPHU a corresponding agreement to extend the term of the MEE License Agreement through and including December 31, 2014, with an additional nine (9) month sell-off period extending from January 1, 2015 through September 30, 2015 (as provided for by the Fourth Amendment).

62.     The Defendants benefited from Plaintiff 3TAC's payment of the $19 Million Payment.

I.   The West Loop Affiliate Sublicense.

63.     Plaintiff 3TAC and Plaintiff West Loop are "Affiliates" within the definition of the MEE License Agreement.

64.     Plaintiff 3TAC and Plaintiff West Loop entered into a written sublicense agreement dated as of April 1, 2014 (the "West Loop Affiliate Sublicense"), pursuant to which Plaintiff 3TAC granted to Plaintiff West Loop a sublicense of Plaintiff 3TAC's rights under the MEE License Agreement for a term that was coterminous with the MEE License Agreement.

65.     More particularly, under Section 1.1 of the West Loop Affiliate Sublicense, Plaintiff 3TAC granted to Plaintiff West Loop any and all rights of Plaintiff 3TAC under the MEE License Agreement, thereby including "the right and license during the Term to use the Ecko IP within the Ecko Territory, on and in connection with the design, manufacture,

distribution, sale and/or promotion of Products" (with such capitalized terms having the meanings ascribed to them in the MEE License Agreement).

66.     Pursuant to the MEE License Agreement (including without limitation its Fourth Amendment) and the West Loop Affiliate Sublicense, Plaintiffs received the rights from Defendant IPHU to design, manufacture, distribute, sell and promote apparel products bearing the ECKO UNLTD. and/or MARC ECKO trademarks throughout the United States from May 17, 2013 through and including December 31, 2014, with an additional nine (9) month sell-off period extending from January 1, 2015 through September 30, 2015.

J.   Defendants' False Representations.

67.     As part of Defendants' pattern and practice of bad-faith and intentionally injurious conduct toward Gerszberg and his affiliates, at multiple times between May 17, 2013 and December 31, 2014 (while the MEE License Agreement was in effect), Defendants made (and/or caused to be made) materially false representations to third-parties (including without limitation to Plaintiffs' actual and/or prospective customers) by which Defendants falsely represented that Plaintiffs' rights under the MEE License Agreement had terminated.  These statements were knowingly false, as Plaintiffs' rights were in fact in full force and effect by way of the agreed-upon and fully-paid-for extension embodied in the Fourth Amendment to the MEE License Agreement.

68.     By way of example, on or about April 7, 2014 (during the term of the MEE License Agreement), the Director of Public Relations for the Defendants (Jennifer Hoffman) made materially false representations to the Wall Street Journal (specifically to Wall Street Journal reporter Sara Randazzo) by which Defendants falsely represented that Plaintiffs' rights under the MEE License Agreement had terminated when Plaintiffs' rights in fact had been in full

force and effect by way of an agreed-upon and fully-paid for extension embodied in the Fourth Amendment to the MEE License Agreement.  Defendants made such communication for the express purpose of causing the Wall Street Journal to widely disseminate such false information to Plaintiffs' actual and/or prospective customers.

69.     By way of further example, in or about July 2014 (during the term of the MEE License Agreement), Defendant Iconix (acting for itself and as agent of Defendant IPHU) made materially false representations to Brian McNamara (a Vice President of Burlington Stores) and/or others at Burlington Stores by which Defendants falsely represented that Plaintiffs' rights under the MEE License Agreement had terminated when Plaintiffs' rights in fact had been in full force and effect by way of an agreed-upon and fully-paid for extension embodied in the Fourth Amendment to the MEE License Agreement.

70.     By way of further example, at or about the same time (during the term of the MEE License Agreement), Defendant Iconix (acting for itself and as agent of Defendant IPHU) made materially false representations to Marcus Drexler (responsible for purchases at Stage Stores) and/or others at Stage Stores by which Defendants falsely represented that Plaintiffs' rights under the MEE License Agreement had terminated when Plaintiffs' rights in fact had been in full force and effect by way of an agreed-upon and fully-paid for extension embodied in the Fourth Amendment to the MEE License Agreement.

71.     By way of further example, at or about the same time (during the term of the MEE License Agreement), Defendant Iconix (acting for itself and as agent of Defendant IPHU) made materially false representations to Lisa Roby (responsible for purchases at Dillard's Department Stores) and/or others at Dillard's Department Stores by which Defendants falsely represented that Plaintiffs' rights under the MEE License Agreement had terminated when

Plaintiffs' rights in fact had been in full force and effect by way of an agreed-upon and fully-paid for extension embodied in the Fourth Amendment to the MEE License Agreement.

72.     By way of further example, at or about the same time (during the term of the MEE License Agreement), Defendant Iconix (acting for itself and as agent of Defendant IPHU) made materially false representations to Michael Wallen (responsible for purchases at National Stores) and/or others at National Stores by which Defendants falsely represented that Plaintiffs' rights under the MEE License Agreement had terminated when Plaintiffs' rights in fact had been in full force and effect by way of an agreed-upon and fully-paid for extension embodied in the Fourth Amendment to the MEE License Agreement.

73.     Upon information and belief, Defendants' materially false representations were made by and at the express instruction of Defendant Cole, and implemented through each of Defendant Iconix and Defendant IPHU.  Defendant Cole caused these materially false representations to be made by the companies he controlled as part of his ongoing malicious scheme to destroy Gerszberg and Gerszberg's affiliated companies.

74.     Defendants' materially false representations were derogatory to Plaintiffs' businesses and properties, constituting false, derogatory and damaging representations concerning (a) Plaintiffs' contractual rights, (b) Plaintiffs' intellectual property rights, and (c) the authenticity of Plaintiffs' products.  Defendants' false statements created the false and injurious implications that (1) Plaintiffs did not validly hold the trademark and distribution rights they claimed to hold and  (2) their entire line of products were unauthorized, inauthentic and/or infringing.

75.     Defendants' materially false representations impeached the integrity and/or business methods of Plaintiffs themselves, impairing the good will  thatMEE had worked hard to

develop over many years.

76.     Defendants made (and/or caused to be made) such misrepresentations knowingly, intentionally, in bad faith and motivated solely by malice and/or disinterested malevolence, without legal or social justification.

77.     Defendants' materially false representations were calculated to prevent Burlington Stores, Stage Stores, Dillard's Department Stores, National Stores and others from doing business with Plaintiffs and/or to otherwise interfere with Plaintiffs' business relationships.

78.     As a direct and proximate result of Defendants' misrepresentations, businesses (including without limitation Burlington Stores, Dillard's Department Stores, Stage Stores and National Stores) did not place purchase orders with Plaintiffs which such businesses otherwise would have made, and/or had previously made.

79.     Upon information and belief, Plaintiffs lost at least $10,000,000 of revenue, equating to at least $3,000,000 of gross profit, by virtue of Burlington Stores, Dillard's Department Stores, Stage Stores and National Stores having failed to place purchase orders with Plaintiffs due to Defendants' materially false representations.

80.     Upon information and belief, as a direct and proximate result of Defendants' misrepresentations, Defendants wrongfully diverted sales by which businesses (including without limitation Burlington, Dillard's Department Stores, Stage Stores and National Stores) placed orders with Defendant IPHU and/or Defendant IPHU's third-party licensees rather than Plaintiffs.  Defendants wrongfully profited from any and all such diverted sales that occurred because of Defendants' affirmative misrepresentations and wrongdoing.  The quantum of such diverted sales and the quantum of such wrongful profits are not yet known to Plaintiffs as such information is in the exclusive possession, custody and control of Defendants and third parties.

81.     Also as a direct and proximate result of Defendants' affirmative misrepresentations, Plaintiffs were deprived of the full benefit of Plaintiff 3TAC's $19 Million Payment.

K.      The Inconsistent New Rise License

82.     Unbeknownst to Plaintiffs at the time, Defendant IPHU and New Rise entered into a written License Agreement dated November 26, 2013, a true and correct copy of which is attached hereto as Exhibit G (the "New Rise License").

83.     Pursuant to Section 1.1 of the New Rise License, Defendant IPHU granted New Rise the exclusive rights to use the mark ECKO UNLIMITED in connection with the manufacture, advertising, promotion, marketing, distribution, offering for sale and sale of men's apparel products throughout the United States, for the period from January 1, 2015 through September 30, 2015.

84.     The exclusive rights that Defendant IPHU granted to New Rise in the New Rise License are directly inconsistent with the rights that Defendant IPHU granted to Plaintiffs by virtue of the Fourth Amendment.  More particularly, under the Fourth Amendment, Defendant IPHU had granted to Plaintiffs the rights to use and sublicense use of the Ecko Brands on and in connection with sale of apparel products throughout the United States for a period of time inclusive of January 1, 2015 through September 30, 2015, but Defendants ignored and attempted to destroy those rights by Defendant IPHU having granted to New Rise a directly inconsistent license under which New Rise was granted and assured exclusive licensed rights during such period.

COUNT I
(Breach of Contract – Plaintiff 3TAC)

85.     Plaintiff 3TAC re-alleges and incorporates by reference, as if fully set forth herein, the allegations contained in paragraphs 1-84 above.

86.     Plaintiff 3TAC and Defendant IPHU were parties to the MEE License Agreement.

87.     Plaintiff 3TAC performed its obligations under the MEE License Agreement.

88.     Defendant IPHU failed to perform its obligations under the MEE License Agreement, including by having made (and/or caused to be made) materially false representations to third-parties (including without limitation Burlington Stores, Dillard's Department Stores, Stage Stores, National Stores and the Wall Street Journal) by which Defendants falsely represented that Plaintiffs' rights under the MEE License Agreement had terminated when Plaintiffs' rights in fact had been in full force and effect by way of an agreed-upon and fully-paid for extension embodied in the Fourth Amendment to the MEE License Agreement.

89.     By having made (and/or caused to be made) such materially false representations, Defendant IPHU breached (a) Section 1.1(a) of the MEE License Agreement, pursuant to which Defendant IPHU had granted to Plaintiff 3TAC the "right and license during the Term to use the Ecko IP within the Ecko Territory, on and in connection with the design, manufacture, distribution, sale and/or promotion of Products" (with such capitalized terms having the meanings ascribed to them in the MEE License Agreement); and (b) Section 1.5 of the MEE License Agreement, pursuant to which Plaintiff 3TAC was granted the right to sublicense such rights to its affiliates, including Plaintiff West Loop.  These grants of a license were rendered illusory, as they were effectively nullified by Defendants' affirmative misrepresentations to the relevant customer base that Plaintiffs had no license.

27

90.     Defendant IPHU also breached the implied covenant of good faith and fair dealing in the MEE License Agreement, including by having made (and/or caused to be made) such materially false representations to third-parties that effectively negated the grant of a license.

91.     The implied covenant of good faith and fair dealing inherent in the License Agreement prohibited Defendant IPHU from doing anything that would have the effect of destroying or injuring the right of Plaintiffs to receive the benefits of the contract.  By making the license-negating misrepresentations to third parties, Defendant IPHU breached the implied covenant of good faith and fair dealing, depriving Plaintiff 3TAC of the right to receive the core benefits promised under the MEE License Agreement and West Loop Affiliate Sublicense.

92.     Defendant IPHU additionally failed to perform its obligations under the MEE License Agreement by having granted rights to New Rise in the New Rise License that were directly inconsistent with the rights that Defendant IPHU granted to Plaintiffs by virtue of the Fourth Amendment.

93.     Defendant IPHU also breached the implied covenant of good faith and fair dealing in the MEE License Agreement, including by having granted rights to New Rise in the New Rise License that were directly inconsistent with the rights that Defendant IPHU granted to Plaintiffs by virtue of the Fourth Amendment.

94.     Defendant IPHU's breaches deprived Plaintiff 3TAC of the consideration promised to it under the Fourth Amendment in exchange for the $19 Million Payment, resulting in a failure of consideration.

95.     Defendant IPHU's breaches constituted breaches of the very essence and core of the MEE License Agreement.  Defendant IPHU's breaches were so substantial and fundamental

as to defeat the entire purpose of Plaintiff 3TAC and Defendant IPHU entering into the Fourth Amendment to the MEE License Agreement.

96.    Defendant IPHU's breaches were willful and intentional.  The breaches were of such nature and such importance that Plaintiff 3TAC would not have entered into the Fourth Amendment had it known that Defendant IPHU would commit such breaches.

97.    As a direct and proximate result of Defendant IPHU's breaches, Plaintiff 3TAC sustained damages.

98.    By reason of the foregoing, Plaintiff 3TAC is entitled to compensatory damages, restitution damages, rescission damages, rescission and/or reformation of the Fourth Amendment, and/or other forms of appropriate legal and equitable relief.

COUNT II
<u>(Breach of Contract – Plaintiff West Loop)</u>

99.    Plaintiff West Loop re-alleges and incorporates by reference, as if fully set forth herein, the allegations contained in paragraphs 1-84 above.

100.    Plaintiff 3TAC and Defendant IPHU were parties to the MEE License Agreement.

101.    Plaintiff 3TAC and Plaintiff West Loop entered into a written sublicense agreement dated as of April 1, 2014 (the "West Loop Affiliate Sublicense"), pursuant to which Plaintiff 3TAC granted to Plaintiff West Loop a sublicense of Plaintiff 3TAC's rights under the MEE License Agreement for a term that was coterminous with the MEE License Agreement.

102.    As set forth above, Plaintiff 3TAC and Defendant IPHU intended to confer all of the benefits of the MEE License Agreement to Plaintiff 3TAC's affiliates, including Plaintiff West Loop, as shown by the parties' discussions surrounding the 2009 transaction, the pass-through structure of the license, and the language of the MEE License Agreement.

29

103.     The benefits of the MEE License Agreement conferred upon Plaintiff West Loop were clear and direct, and not merely incidental.

104.     Plaintiff West Loop was an intended third-party beneficiary under the MEE License Agreement.

105.     Plaintiff 3TAC performed its obligations under the MEE License Agreement.

106.     Plaintiff West Loop performed its obligations under the West Loop Affiliate Sublicense.

107.     Defendant IPHU failed to perform its obligations under the MEE License Agreement, including by having made (and/or caused to be made) materially false representations to third-parties (including without limitation Burlington Stores, Dillard's Department Stores, Stage Stores, National Stores and the Wall Street Journal) by which Defendants falsely represented that Plaintiffs' rights under the MEE License Agreement had terminated when Plaintiffs' rights in fact had been in full force and effect by way of an agreed-upon and fully-paid for extension embodied in the Fourth Amendment to the MEE License Agreement.

108.     By having made (and/or caused to be made) such materially false representations, Defendant IPHU breached (a) Section 1.1(a) of the MEE License Agreement, pursuant to which Defendant IPHU had granted to Plaintiff 3TAC the "right and license during the Term to use the Ecko IP within the Ecko Territory, on and in connection with the design, manufacture, distribution, sale and/or promotion of Products" (with such capitalized terms having the meanings ascribed to them in the MEE License Agreement); and (b) Section 1.5 of the MEE License Agreement, pursuant to which Plaintiff 3TAC was granted the right to sublicense such rights to its affiliates, including Plaintiff West Loop.  These grants of a license were rendered

illusory, as they were effectively nullified by Defendants' affirmative misrepresentations to the relevant customer base that Plaintiffs had no license.

109.    Defendant IPHU also breached the implied covenant of good faith and fair dealing in the MEE License Agreement, including by having made (and/or caused to be made) such materially false representations to third-parties that effectively negated the grant of a license and sublicense.

110.    The implied covenant of good faith and fair dealing inherent in the License Agreement prohibited Defendant IPHU from doing anything that would have the effect of destroying or injuring the right of Plaintiffs to receive the benefits of the contract.  By making the license-negating misrepresentations to third parties, Defendant IPHU breached the implied covenant of good faith and fair dealing, depriving Plaintiff West Loop of the right to receive the core benefits promised under the MEE License Agreement and West Loop Affiliate Sublicense.

111.    Defendant IPHU additionally failed to perform its obligations under the MEE License Agreement by having granted rights to New Rise in the New Rise License that were directly inconsistent with the rights that Defendant IPHU granted to Plaintiffs by virtue of the Fourth Amendment.

112.    Defendant IPHU also breached the implied covenant of good faith and fair dealing in the MEE License Agreement, including by having granted rights to New Rise in the New Rise License that were directly inconsistent with the rights that Defendant IPHU granted to Plaintiffs by virtue of the Fourth Amendment.

113.    Defendant IPHU's breaches deprived Plaintiff West Loop of the consideration promised under the Fourth Amendment for which Plaintiff West Loop was a third-party beneficiary, resulting in a failure of consideration.

114.     Defendant IPHU's breaches constituted breaches of the very essence and core of the MEE License Agreement, including without limitation Plaintiff West Loop's rights thereunder.  Defendant IPHU's breaches were so substantial and fundamental as to defeat the entire purpose of Plaintiff 3TAC and Defendant IPHU entering into the Fourth Amendment to the MEE License Agreement, including as it related to Plaintiff West Loop's rights thereunder.

115.      Defendant IPHU's breaches were willful and intentional.  The breaches were of such nature and such importance that Plaintiff West Loop would not have entered into the West Loop Affiliate Sublicense had it known that Defendant IPHU would commit such breaches.

116.     As a direct and proximate result of Defendant IPHU's breaches, Plaintiff West Loop sustained damages.

117.     By reason of the foregoing, Plaintiff West Loop is entitled to compensatory damages, restitution damages, rescission damages and/or other forms of appropriate legal and equitable relief.

COUNT III
<u>(Unjust Enrichment)</u>

118.     Plaintiffs re-allege and incorporate by reference, as if fully set forth herein, the allegations contained in paragraphs 1-84 above.

119.     Defendants were unjustly enriched at the expense of Plaintiffs by virtue of (a) Defendants' wrongfully procuring from Plaintiff 3TAC the $19 Million Payment for purported license rights that Plaintiffs did not actually receive because Defendants had been sabotaging, and would continue to sabotage and devalue, those license rights; (b) Defendants' obtaining the value of Plaintiffs' good-faith investments and expenditures in connection with marketing and support of the Brands and generation of good will and sales that resulted in revenues flowing to Defendants before, during, and after the term of the Fourth Amendment; and

(c) Defendants' wrongful profiting from their own wrongdoing by receiving benefits and payments flowing from their misappropriation of Plaintiffs' good will and intellectual property rights and their fraudulent diversion of sales to Plaintiffs' competitors by causing businesses (including Burlington, Dillard's Department Stores, Stage Stores and National Stores) to place orders with Defendant IPHU and/or Defendant IPHU's third-party licensees rather than Plaintiffs.

120.    It is against equity and good conscience to permit Defendants to retain the aforementioned benefits and/or any other benefits obtained through their willful, malicious, fraudulent and abusive practices described herein.

121.    By reason of the foregoing, Plaintiffs are entitled to restitution of the amount they paid for an illusory license extension; restitution of the value of any benefits Plaintiffs conferred upon Defendants or their businesses, including with respect to the Brands as a result of Plaintiffs' marketing and support efforts; disgorgement of any profits, revenues, or benefits received by Defendants directly or indirectly as a result of Defendants' misappropriation or diversion of sales to Defendant IPHU and/or Defendant IPHU's third-party licensees rather than Plaintiffs at any time prior to September 30, 2015; and any other amounts by which Defendants were unjustly enriched.

COUNT IV
(Tortious Interference With Contractual Relations – Plaintiff West Loop)

122.    Plaintiff West Loop re-alleges and incorporates by reference, as if fully set forth herein, the allegations contained in paragraphs 1-84 above.

123.    There existed a valid contract between Plaintiff West Loop and Plaintiff 3TAC, namely the West Loop Affiliate Sublicense.

124.     Defendants had knowledge of the existence of the West Loop Affiliate

Sublicense.

125.     Defendants owed Plaintiff West Loop non-contractual duties, including without

limitation duties to refrain from (a) intentionally and maliciously interfering with Plaintiff West

Loop's contractual relations; (b) acting willfully to destroy Plaintiff West Loop's property and/or

business; (c) making knowingly false and defamatory statements concerning Plaintiff West

Loop's property and/or business; and (d) engaging in unfair business tactics and/or other forms

of unfair competition.

126.     Defendants breached such non-contractual duties by having made (and/or caused

to be made) materially false representations to third-parties (including without limitation

Burlington Stores, Dillard's Department Stores, Stage Stores, National Stores and the Wall Street

Journal) by which Defendants falsely represented that Plaintiffs' rights under the MEE License

Agreement had terminated when Plaintiffs' rights in fact had been in full force and effect by way

of an agreed-upon and fully-paid for extension embodied in the Fourth Amendment to the MEE

License Agreement.

127.     By having represented that Plaintiffs' rights under the MEE License Agreement

had terminated, Defendants caused Plaintiff 3TAC to breach Section 1.1 of the West Loop

Affiliate Sublicense, pursuant to which Plaintiff 3TAC had granted to Plaintiff West Loop any

and all rights of Plaintiff 3TAC under the MEE License Agreement, thereby including "the right

and license during the Term to use the Ecko IP within the Ecko Territory, on and in connection

with the design, manufacture, distribution, sale and/or promotion of Products" (with such

capitalized terms having the meanings ascribed to them in the MEE License Agreement).

128.     By having represented that Plaintiffs' rights under the MEE License Agreement

had terminated, Defendants caused Plaintiff 3TAC to breach the very essence underlying the entirety of the West Loop Affiliate Sublicense.

129.    By having represented that Plaintiffs' rights under the MEE License Agreement had terminated, Defendants caused Plaintiff 3TAC to breach the implied covenant of good faith and fair dealing in the West Loop Affiliate Sublicense by depriving Plaintiff West Loop of the right to receive the benefits promised under the West Loop Affiliate Sublicense.

130.    Defendants intentionally induced and/or procured Plaintiff 3TAC's breach of the West Loop Affiliate Sublicense, without justification.

131.    Defendants intentionally frustrated and rendered Plaintiff 3TAC's performance under the West Loop Affiliate Sublicense impossible, without justification.

132.    Defendants willfully intended to harm Plaintiff West Loop.

133.    As a direct and proximate result of Defendants' interference with the West Loop Affiliate Sublicense, Plaintiff West Loop sustained damages, including without limitation damages for lost business and profits, out-of-pocket expenses, and consequential or incidental damages resulting from Defendants' intentional misconduct.

COUNT V
(Tortious Interference With Prospective Economic Relations)

134.    Plaintiffs re-allege and incorporate by reference, as if fully set forth herein, the allegations contained in paragraphs 1-84 above.

135.    Plaintiffs had prospective business relations with third-parties, including without limitation Burlington Stores, Dillard's Department Stores, Stage Stores, National Stores, and other prospective customers.  Some or all such customers had previously placed substantial orders for Ecko Brands apparel with MEE under license of Plaintiff 3TAC and were expected to

do so again with Plaintiff West Loop in the absence of tortious interference by Defendants.

136.   Defendants knew of these business relationships, many of which were long-standing customers of Plaintiff 3TAC and/or its affiliated sublicensees.

137.   Defendants owed Plaintiffs non-contractual duties, including without limitation duties to refrain from (a) intentionally and maliciously interfering with Plaintiffs' business relations; (b) acting willfully to destroy Plaintiffs' property and/or business; (c) making knowingly false and defamatory statements concerning Plaintiffs' property and/or business; and (d) engaging in unfair business tactics and/or other forms of unfair competition.

138.   Defendants knowingly and intentionally interfered with Plaintiffs' business relations and breached such non-contractual duties by making (and/or causing to be made) materially false representations to third-parties (including Burlington Stores, Dillard's Department Stores, Stage Stores, National Stores and the Wall Street Journal) pursuant to which such third-parties were falsely advised that Plaintiffs' rights under the MEE License Agreement had terminated when in fact they had not.

139.   Defendants acted solely out of malice, as described above.  Defendants' interference was undertaken for the sole purpose of inflicting intentional harm on Plaintiffs, as part of their scheme to destroy Gerszberg and his businesses and properties arising from Defendant Cole's personal animus and bad-faith business motives.

140.   Defendants intended to harm Plaintiffs, including by willfully causing damage to Plaintiffs' prospective business relationships.

141.   Defendants also used dishonest, wrongful, unfair and improper means, including fraud, misrepresentation, trade libel, and economic duress.

142.   Defendants' misrepresentations and interfering acts were made without legal or

social justification.

143.    Defendants' misrepresentations and interfering acts injured Plaintiffs'

relationships with actual and prospective customers.  As a direct and proximate result of

Defendants' misrepresentations and other acts of sabotage, third-party businesses (including

without limitation Burlington Stores, Dillard's Department Stores, Stage Stores and National

Stores) did not place purchase orders with Plaintiffs that they otherwise would have placed.

144.    Defendants' tortious conduct caused Plaintiffs to suffer substantial pecuniary

damages including without limitation special damages believed to include at least $10,000,000 of

lost revenue, equating to at least $3,000,000 of gross profits, by virtue of Burlington Stores,

Dillard's Department Stores, Stage Stores and National Stores having failed to place purchase

orders with Plaintiffs due to Defendants' knowing and intentional false statements.  The precise

amount of such damages, which are within the exclusive knowledge of Defendants and third

parties, will be ascertained in discovery and shown at trial.

## COUNT VI
### (Trade Libel)

145.    Plaintiffs re-allege and incorporate by reference, as if fully set forth herein, the

allegations contained in paragraphs 1-84 above.

146.    Defendants knowingly, and without justification, made (and/or caused to be

made) materially false representations to third-parties (including without limitation Burlington

Stores, Dillard's Department Stores, Stage Stores, National Stores and the Wall Street Journal)

by which Defendants falsely represented that Plaintiffs' rights under the MEE License

Agreement had terminated when Plaintiffs' rights in fact had been in full force and effect by way

of an agreed-upon and fully-paid for extension embodied in the Fourth Amendment to the MEE

License Agreement.

147.    Defendants' materially false representations were derogatory to Plaintiffs' businesses and properties, including without limitation as constituting false, derogatory and damaging representations concerning (a) Plaintiffs' contractual rights, (b) Plaintiffs' intellectual property rights; and (c) the authenticity of Plaintiffs' products.  Defendants' false statements created the false and injurious implications that (1) Plaintiffs did not validly hold the trademark and distribution rights they claimed to hold and  (2) their entire line of products were unauthorized, inauthentic and/or infringing.

148.    Defendants' materially false representations were calculated to prevent others from doing business with Plaintiffs and/or to otherwise interfere with Plaintiffs' business relationships.

149.    Defendants' materially false communications induced others (including without limitation Burlington Stores, Dillard's Department Stores, Stage Stores and National Stores) not to have business dealings with Plaintiffs.

150.    Defendants made (and/or caused to be made) such false communications knowingly, intentionally, in bad faith and motivated solely by malice and/or disinterested malevolence, without legal or social justification.

151.    Plaintiffs suffered economic and other special damages as a natural and immediate consequence of Defendants' false representations, including without limitation special damages believed to include at least $10,000,000 of lost revenue, equating to at least $3,000,000 of gross profits, by virtue of Burlington Stores, Dillard's Department Stores, Stage Stores and National Stores having failed to place purchase orders with Plaintiffs due to Defendants' knowing and intentional trade libel.  The precise amount of such damages, which are within the

exclusive knowledge of Defendants and third parties, will be ascertained in discovery and shown at trial.

## COUNT VII
### (Unfair Competition)

152.    Plaintiffs re-allege and incorporate by reference, as if fully set forth herein, the allegations contained in paragraphs 1-84 above.

153.    As detailed above, Defendants knowingly, and without justification, made (and/or caused to be made) materially false representations to third-parties (including without limitation Burlington Stores, Dillard's Department Stores, Stage Stores, National Stores and the Wall Street Journal), falsely representing that Plaintiffs' rights under the MEE License Agreement had terminated when Plaintiffs' rights in fact were in full force and effect pursuant to the Fourth Amendment to the MEE License Agreement.

154.    These false and derogatory statements about Plaintiffs' products and business constituted a form of false labeling and/or deceptive advertising regarding Plaintiffs' products and business, falsely implying that Plaintiffs' products were unauthorized, inauthentic or infringing.

155.    Defendant IPHU unfairly made (and/or caused to be made) such false communications knowingly, intentionally, in bad faith, and with the intent to deceive customers and/or to cause confusion in the market regarding Plaintiffs' products and business, and thereby to drive actual and prospective customers away from Plaintiffs.

156.    Upon information and belief, as a direct and proximate result of Defendants' misrepresentations, actual and prospective customers were deceived and/or confused regarding Plaintiffs' contract rights and intellectual property rights and the authenticity of Plaintiffs'

products and, as a result, such actual and prospective customers (including without limitation Burlington, Dillard's Department Stores, Stage Stores and National Stores) failed to place orders with Plaintiffs and/or placed orders with Defendant IPHU and/or Defendant IPHU's third-party licensees rather than Plaintiffs.

157.    Defendants wrongfully profited from any and all such sales diverted to Plaintiffs' competitors.

158.    By effectively negating the intellectual property license rights granted to Plaintiffs through their misrepresentations to the relevant customer base, Defendants essentially misappropriated Plaintiffs' rightful intellectual property and contract rights, as well as Plaintiffs' labor, expenditures, and good will, to Defendants themselves.  Defendants improperly diverted and misused those valuable rights and assets for their own benefit and for the benefit of Plaintiffs' competitors from which Defendants derived benefits and gain.

159.    Defendants' wrongful acts constituted unfair competition.

160.    Plaintiffs suffered damages as a result of Defendants' unfair and immoral tactics, including without limitation damages for lost business and profits, out-of-pocket expenses, and consequential or incidental damages resulting from Defendants' intentional misconduct.

COUNT VIII
(Prima Facie Tort)

161.    Plaintiffs re-allege and incorporate by reference, as if fully set forth herein, the allegations contained in paragraphs 1-84 above.

162.    By their misrepresentations and other oppressive, abusive misconduct described above, Defendants intentionally inflicted harm upon Plaintiffs.

163.    Defendants inflicted such harm without excuse or justification.

164.     Defendants acted in bad faith, with intent motivated solely by malice and/or disinterested malevolence, without legal or social justification.

165.     Defendants inflicted such harm by an act or series of acts which are otherwise legal.

166.     As a direct and proximate result of Defendants' misrepresentations, businesses (including without limitation Burlington Stores, Dillard's Department Stores, Stage Stores and National Stores) did not place purchase orders with Plaintiffs which such businesses otherwise would have made.

167.     Defendants' wrongful conduct resulted in Plaintiffs suffering special damages. As a direct and proximate result of Defendants' misrepresentations, Plaintiffs suffered specific measurable loss, including in the form of lost sales, lost revenues and lost profits, as described above.

168.     As a direct and proximate result of Defendants' misrepresentations, Plaintiffs did not receive the full benefit of Plaintiff 3TAC's $19 Million Payment.

WHEREFORE, Plaintiffs demand judgment in their favor, awarding them:

a.   compensatory damages for all of Plaintiffs' losses on all causes of action, in an amount to be shown at trial;

b.   restitution and/or disgorgement of all amounts by which Defendants were unjustly enriched through their wrongful tactics (including without limitation recovery of the $19 Million Payment), in an amount to be shown at trial;

c.   rescission and/or reformation of the Fourth Amendment (including without limitation recovery of the $19 Million Payment);

d.   consequential and incidental damages caused by Defendants' wrongful conduct, in an amount to be shown at trial;

e.   punitive damages, due to Defendants' malicious, evil and reprehensible motives and their wanton, willful, intentionally harmful tortious conduct;

f.   costs of suit;

g.   interest;

h.   attorneys' fees; and

i.   such other and further relief as the Court deems just and proper.

## **<u>JURY DEMAND</u>**

Plaintiff hereby requests a trial by jury on all issues so triable.

Dated:  June 11, 2018

By:   _____
Gregg Donnenfeld, Esq.
DONNENFELD LAW PLLC
P.O. Box 280
Greenvale, NY 11548
917-251-2452
Gregg@DonnenfeldLaw.com
*Attorney for Plaintiffs*
   *3TAC, LLC and West Loop South, LLC*